UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Civil No. 3:18CV166 |
| | : | |
| ONE PARCEL OF PROPERTY | : | |
| LOCATED AT 84 JOSHUA TOWN | : | |
| ROAD, | : | |
| | : | |
| AND | : | |
| | : | |
| ONE PARCEL OF PROPERTY | : | |
| LOCATED AT LOT 15, JOSHUA TOWN | : | |
| ROAD, | : | |
| | : | |
| WATERBURY, CONNECTICUT, | : | |
| WITH ALL APPURTENANCES AND | : | |
| IMPROVEMENTS THEREON, | : | |
| | : | |
| Defendants. | : | January 29, 2018 |
| | : | |
| [CLAIMANTS: LEON W. VACCARELLI | : | |
|   MONICA C. VACCARELLI, AND | : | |
|   THOMASTON SAVINGS BANK] | : | |

VERIFIED COMPLAINT OF FORFEITURE

Plaintiff, United States of America, by and through its attorneys, John H. Durham, United

States Attorney for the District of Connecticut, and Julie G. Turbert, Assistant United States

Attorney, brings this complaint and alleges as follows in accordance with Rule G(2) of the

Supplemental Rules for Admiralty Maritime and Forfeiture Claims:

**NATURE OF ACTION**

1.      This is a civil action *in rem* brought to enforce the provision of 18 U.S.C. §

981(a)(1)(A) for the forfeiture of property involved in a financial transaction in violation of 18

U.S.C. § 1956 or 1957, or to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture

of property which constitutes or is derived from proceeds traceable to an offense constituting

"specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), namely, mail or wire fraud

in violation of 18 U.S.C. § 1341 or 1343, or conspiracy to commit such offense.

## THE DEFENDANTS IN REM

2.      The property defendants consist of one parcel of property located at 84 Joshua

Town Road, and one parcel of property located at Lot 15, Joshua Town Road, Waterbury,

Connecticut, with all appurtenances and improvements thereon (property defendants), more

particularly described in Exhibit A, which is attached hereto at incorporated herein by reference.

3.      The record owners of the property defendants are Leon W. Vaccarelli and Monica

C. Vaccarelli.

4.      The property defendant located at 84 Joshua Town Road is owner occupied

residential property.

5.      The property defendant located at Lot 15, Joshua Town Road is vacant land.

6.      The property defendant located at 84 Joshua Town Road was acquired by Leon

W. Vaccarelli and Monica C. Vaccarelli for $108,000.00, by warranty deed, dated May 27, 2008,

and recorded May 29, 2008, in Volume 6373, Page 164, of the Waterbury, Connecticut, Land

Records.

7.      The property defendant located at Lot 15, Joshua Town Road was acquired by

Leon W. Vaccarrelli and Monica C. Vaccarelli for $80,000.00, by warranty deed, dated June 13,

2011, and recorded June 13, 2011, in Volume 6813, Page 112, of the Waterbury, Connecticut,

Land Records.

8.      Thomaston Savings Bank may have an interest in the property defendants by virtue of a mortgage in the original principal amount of $260,000, dated June 13, 2011, and recorded June 13, 2011, in Volume 6813, Page 113, of the Waterbury, Connecticut, Land Records. The mortgage contains a construction rider and, according to the Waterbury Assessor's records, a house was built in 2011. The outstanding balance of the mortgage as of July 1, 2017 is $237,134.88.

9.      The property defendant located at 84 Joshua Town Road has a fair market value of approximately $255,000.00.

10.     The property defendant located at Lot 15, Joshua Town Road has a fair market value of approximately $50,000.00.

11.     The property defendants have not been seized and is located in the District of Connecticut. The United States will, as provided by 18 U.S.C. § 985(b)(1) and (c)(1):

    a.      post notice of this action and a copy of the Complaint on the property defendants, and

    b.      serve notice of this action on the property owners, and any other person or entity who may claim an interest in the property defendants, along with a copy of the Complaint, and

    c.      execute a writ of entry for purposes of conducting an inspection and inventory of the property, and

    d.      file a lis pendens in the Waterbury, Connecticut Land Records of the property defendant's status as defendants in this in rem action.

12.     The United States will also, as provided in 19 U.S.C. §1606, appraise the property

defendants when it executes a Writ of Entry.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the

property defendants. This Court has jurisdiction over an action commenced by the United States

pursuant to 28 U.S.C. § 1345, and over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

14.     This Court has *in rem* jurisdiction over the property defendants pursuant to 28

U.S.C. 1355(b).

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A), because the

acts or omissions giving rise to the forfeiture occurred in this district.

## BASIS FOR FORFEITURE

16.     The property defendants are subject to forfeiture pursuant to 18 U.S.C. §

981(a)(1)(A) because they constitute property involved in a financial transaction in violation of

18 U.S.C. § 1956 or 1957, or pursuant to 18 U.S.C. § 981(a)(1)(C) because they constitute or are

derived from proceeds traceable to an offense constituting "specified unlawful activity" (as

defined in 18 U.S.C. § 1956(c)(7)), namely wire fraud in violation of 18 U.S.C. § 1343, or

conspiracy to commit such offense.

## FACTS

17.     From approximately September 2012 through early 2017, Leon Vaccarelli

(VACCARELLI) engaged in a scheme and artifice to defraud individual victims by falsely

representing to them that he would invest their funds or remit funds to the appropriate party

when, as he well knew, he intended to use the money for other expenses, including payments for

4

personal expenditures.

18.     From February 2011 to July 19, 2017, VACCARELLI was a registered representative of the brokerage company, The Investment Center (TIC), as well as an investment adviser associated with IC Advisory Services, Inc. (IC Advisory), at a branch in Waterbury, Connecticut.

19.     In 2015, FINRA fined VACCARELLI $7,500 and suspended him from associating with a broker-dealer for one month for unauthorized trading in four customer accounts. Subsequently, TIC placed him on heightened supervision. On July 17, 2017 VACCARELLI was fired by TIC and IC Advisory for his failure to comply with firm policies requiring him to allow access to his office during an examination to investigate the allegations raised by a complaint filed by the Securities and Exchange Commission.

20.     VACCARELLI conducted his business under a DBA, "Lux Financial," for which he had a separate bank account at the bank that held his personal account.

21.     LWLVACC, LLC (LWLVACC), is a limited liability company incorporated in Connecticut with its principal place of business in Waterbury, Connecticut. VACCARELLI is its only member. VACCARELLI used LWLVACC for his so-called investment business. VACCARELLI had sole signing authority over its bank account and used that account interchangeably with other accounts to deposit money from investors and form the trust that VACCARELLI managed. The bank account was at the same bank as his personal and Lux Financial accounts.

22.     During the course of the scheme and described more thoroughly herein, VACCARELLI fraudulently obtained and/or fraudulently converted approximately $1.5 million

from over ten victims. VACCARELLI made materially false statements to induce the victims to transfer funds to him to invest in what VACCARELLI represented were private loans and investments. VACCARELLI utilized wire communications to initiate the sale or surrender of the victims' legitimate investments. VACCARELLI used the money raised for those so-called investments to pay personal expenses or make Ponzi-like payments to prior investors. A chart summarizing the monies VACCARELLI received from victims and the payments made for his mortgage and to his contractor for improvements on the property defendants is attached as Exhibit B.

23.     VACCARELLI opened three checking accounts at Naugatuck Savings Bank that are pertinent to this investigation. The name of the bank was changed in October 2013 to ION Bank, but the account numbers did not change; LWLVACC LLC account ending in 7051, LUX Financial Service account ending 5007, and Leon Vaccarelli account ending in 1757.

## VICTIM #1

24.     Victim #1 is 82-years old and s/he and his/her spouse were long time clients of Leon Vaccarelli. In February 2012 VACCARELLI caused a cash surrender request to be faxed to ING. ING issued a check to Victim #1 for $100,343.36 for the surrender of Victim #1's annuity contract. The funds were deposited in the LWLVACC LLC Account #7051. LWLVACC LLC issued Victim #1 an official bank check for $15,000 in April 2012. Victim #1's spouse died on December 2, 2012. VACCARELLI suggested to Victim #1 that he should become the executor for his/her estate. Victim #1 asked his/her children about VACCARELLI'S request to be executor. Victim 1's children were surprised and requested a meeting with Vaccarelli. The family met with VACCARELLI and he provided a summary of Victim 1's Accounts at Lux

Financial on January 15, 2014. The January 2014 statement provided to Victim 1's family does not appear to include an account or investment reflecting the $85,000 provided to LWLVACC LLC. Victim #1 does not recall why they moved the ING annuity. Victim #1's son-in-law reviewed his/her investment statements and thought that VACCARELLI was making inappropriate investments and was not requesting permission to execute trades. Victim #1 moved his/her assets to a different investment advisor. Victim #1's son-in-law has been unable to locate any other payments to Victim #1 from VACCARELLI.

25.     Prior to the March 16, 2012 deposit of $100,343.36, the LWLVACC LLC account # 7051 had a balance of $3,105.86. After the deposit, VACCARELLI made two payments to Eric Strachan, the contractor for the house built on the property defendant located at 84 Joshua Town Road; $35,000 on March 20, 2012 and $7,000 on April 27, 2012. VACCARELLI also made a mortgage payment in the amount of $1,164.58 on April 17, 2012 from that account. *See* Ex. B.

## **VICTIM #2**

26.     Victim #2 invested approximately $80,000 with VACCARELLI. Victim #2 gave VACCARELLI a $38,862.61 check, dated December 4, 2013, payable to the order of Fidelity Investments, FBO of Victim #2. This check represented the proceeds of Victim #2's liquidation of his/her retirement account at a former employer. VACCARELLI represented that he would invest Victim #2's money in a money market account at TIC. In January 2014, VACCARELLI had Victim #2 sign account opening documents for a brokerage account at TIC; however, VACCARELLI deposited the check into his LWLVACC account # 7051 on or about January 16, 2014. Instead of investing Victim #2's money, VACCARELLI used the money to pay personal

expenses and expenses of his business, including payments on a loan connected with VACCARELLI's investment in an office building.

27.     Victim #2 liquidated a pension account he held at another brokerage company. In March 2016, a check for $41,011.18 was issued by the broker-dealer that had held this pension account and made payable to Lux Financial for the benefit of Victim #2's IRA account. Victim #2 gave the check to VACCARELLI to deposit into his brokerage account at TIC. TIC was unable to deposit the check and returned it because it was made out to Lux Financial instead of TIC's clearing brokerage firm. VACCARELLI then represented to Victim #2 that he, VACCARELLI, could cash it so that it could be deposited into Victim #2's brokerage account at TIC. Victim #2 believed that the money would then be invested in a securities money market account. VACCARELLI told Victim #2 that the money was locked up and Victim #2 could only withdraw it if he were to be repaid within 60 days.

28.     VACCARELLI did not deposit the March 2016 check into Victim #2's TIC investment account. Instead, VACCARELLI deposited that check into his personal Lux Financial account #5007. None of that money was ever invested, or even kept in a segregated account. VACCARELLI used the money to pay personal expenses and to pay business related expenses. He made several transfers to his Leon Vaccarrelli account # 1757 and comingled those funds with other victim funds and made two mortgage payments in June, 2016 on property defendants. *See* Ex. B.

29.     In July 2017, VACCARELLI represented to Victim #2 that he had in excess of $90,000 invested. However, VACCARELLI had not invested a single dollar on Victim #2's behalf. The TIC account opened in Victim #2's name was never funded.

## **VICTIM #3**

30.     Victim #3 had been a customer of VACCARELLI for two and a half years and had an IRA account at TIC. Victim #3 had transferred his IRA from another broker-dealer. VACCARELLI represented to Victim #3 that he was obtaining 7% interest on Victim #3's investment. After VACCARELLI obtained control over Victim #3's IRA, the mutual fund holdings that Victim #3 owned were sold and the money was put into a government money market fund that provided minimal returns. In or about February 2016, Victim #3 invested an additional $100,000 with VACCARELLI. VACCARELLI represented to Victim #3 that he would invest the $100,000 at 3% interest, by adding it to Victim #3's account at TIC. VACCARELLI represented that the investment would be similar to Victim #3's existing IRA but that he would have to give thirty days' notice to get his money back.

31.     VACCARELLI deposited the $100,000 check into his LWLVACC account # 7051. VACCARELLI did not invest the money. VACCARELLI used Victim #3's money to pay personal expenses, expenses of his business, including mortgage payments in connection with his investment in an office building, and two home mortgage payments on property defendants; $2,640.87 on February 26, 2016 and $2,640.87 on March 23, 2016. *See* Ex. B.

32.     In or about September 2016, Victim #3 requested the return of the $100,000 s/he had entrusted to VACCARELLI. VACCARELLI persuaded Victim #3 to take the money out of his/her IRA. VACCARELLI represented that he would move the $100,000 that Victim #3 invested in March 2016 to replace the money withdrawn from the IRA.

33.     In September 2016, VACCARELLI directed the distribution of approximately $108,000 from Victim #3's IRA to Victim #3's bank, causing Victim #3 to incur a tax liability for early IRA withdrawals. VACCARELLI never replaced the money that had been withdrawn from the IRA. In or about late 2016, Victim #3 learned from his accountant that the money had not been replaced.

34.     In or about December 2016, Victim #3 confronted VACCARELLI with a copy of his IRA statement, which reflected a balance of less than $500. VACCARELLI represented that the statement was incorrect and told Victim #3 that the IRA account held more than $90,000. VACCARELLI then hand-wrote $90,476 on Victim #3's account statement, to confirm the "actual" amount in the account. In fact, there was only $476 in Victim #3's IRA account at the end of December of 2016.

## **VICTIM # 4**

35.     In September 2015, VACCARELLI persuaded Victim #4 to invest in what he described as a private direct investment. He initially requested $90,000 but accepted $47,000, which Victim #4 obtained by selling an annuity she owned.

36.     On September 24, 2015, VACCARELLI directed Victim #4 to sign a "Private Direct Investment Agreement," which described his/her investment as a "Separate Managed Account[s] 15 month senior note 8% per annum no liquidity of principal." "LWLVACC, LLC (Leon Vaccarelli)" was listed as "advisor" in the agreement.

37.     VACCARELLI represented to Victim #4 that he would invest his/her money in a friends and family investment fund through LWLVACC. Victim #4 understood this to be an investment in securities. Also on September 24, 2015, at VACCARELLI's direction, Victim #4

10

wrote a check for $47,000 payable to LWLVACC. VACCARELLI endorsed the check and deposited the funds into LWLVACC's bank account # 7051.

38.     Victim #4 understood that his/her money was to be used for investments in securities for his/her benefit. In reality, VACCARELLI used it to pay personal expenses and of his business, including mortgage payment in connection with VACCARELLI's investment in an office building.

39.     In or around June 2016, Victim #4 learned that she would incur a tax penalty in connection with the withdrawal from her annuity and contacted VACCARELLI to find out why. Several months later, in October 2016, VACCARELLI met with Victim #4 and provided her with a letter dated October 11, 2016, which stated that an accounting firm would provide her with "appropriate income tax documents and independent verification" at year end.

40.     The day after she received the letter, Victim #4 called the accounting firm named in VACCARELLI's letter and found that the firm was not familiar with the investment and was unable to provide such verification.

41.     During the October meeting in which VACCARELLI hand-delivered the letter to Victim #4, he also asked him/her not to tell TIC about LWLVACC. He told Victim #4 that the reason for his request was that he was not supposed to have an outside investment business while he was associated with TIC.

42.     Upon hearing this, Victim #4, who was already concerned by VACCARELLI's evasive behavior, become more concerned. She retained an attorney who negotiated the return of her $47,000 principal as well as interest and associated penalties. As part of the agreement to return Victim #4's money to him/her, VACCARELLI and his lawyer required Victim #4 to sign

a release in favor of VACCARELLI and LWLVACC that she would not discuss the matter with "FINRA, the [sic] SEC or anyone else."

43.    In mid-December VACCARELLI purchased a bank check to pay the settlement to VICTIM #4. However, this left him with insufficient funds in his bank accounts to cover his personal expenses, causing numerous bounced checks. VACCARELLI then had the bank check canceled and deposited the proceeds into his own bank account.

44.    On January 17, 2017, after VACCARELLI had obtained money from yet another client, VACCARELLI purchased a bank check payable to himself for $59,692.66, using funds from his Lux Financial account. VACCARELLI endorsed the bank check to Victim #4's attorney to settle her claim.

## VICTIM #5

45.    As described above, in January 2017, VACCARELLI needed $59,692.66 to pay back Victim #4. To fund the settlement with Victim #4, VACCARELLI obtained $300,000 from Victim #5, an 88-year old living in a nursing home in Connecticut. Victim #5 had a securities account at TIC, which was held in the name of a living trust for his/her benefit. In around November of 2016, s/he deposited approximately, $300,000 into her living trust at TIC. This money constituted the proceeds from the sale of her condominium. This money was initially invested in mutual funds.

46.    In December 2016, VACCARELLI, persuaded Victim #5 to obtain an account at a local bank in the name of the trust, telling him/her this bank account would enable him/her to pay for her assisted living expenses. As part of that account opening, Victim #5 was provided with three starter checks.

47.     On or about January 11, 2017 VACCARELLI met with Victim #5 and his/her daughter at the assisted living facility. While the daughter was out of the room, VACCARELLI obtained a signed starter check from the local bank account, payable to the order of Lux Financial for $300,000. On January 11, 2017, VACCARELLI caused $300,000 of mutual funds to be sold from Victim #5's living trust account at TIC.

48.     The next day, January 12, 2017, a wire request purportedly signed by Victim #5 on January 12, 2017 was sent to TIC, directing that $300,000 be wired to Victim #5's local bank account. The wire transfer request bore a notary seal representing Victim #5 had signed the wire request in the presence of the notary. The notary who purported signed the signature verification was VACCARELLI's office manager. On information and belief, VACCARELLI's office manager never met Victim #5 and was not present at Victim #5's assisted living facility on January 11 or 12, 2017.

49.     On January 17, 2017, VACCARELLI deposited the $300,000 check drawn on Victim #5's local bank account into his Lux Financial Service account #5007. An incomplete "Direct Investment Agreement Managed Account Agreement" form with an endorsement that purported to be Victim #5's signature, reflected that VACCARELLI had solicited Victim #5 for an investment, to be made through LWLVACC, with LWLVACC and VACCARELLI as an investment adviser.

50.     Victim #5 did not agree to provide VACCARELLI with a loan. Nor did s/he ever agree to change his/her investments without the input of his/her daughter and son-in-law, who is an attorney. VACCARELLI schemed to sell $300,000 worth of mutual fund investment from Victim #5's living trust, and deposited the proceeds into his personal account.

13

51.     On or about July 3, 2017, VACCARELLI represented to Victim #5's daughter that Victim #5's $300,000 had been invested in a 30 month investment at 6%. In actuality, Victim #5's money had not been invested. Indeed, it was not even segregated. Instead it was comingled with VACCARELLI's personal and business accounts.

52.     VACCARELLI did not invest any of the funds obtained from Victim #5's living trust fund in any of the contemplated investments listed on the incomplete direct investment agreement for Victim #5. VACCARELLI used Victim #5's money to pay personal expenses and business expenses, and to pay off prior investors, including Victim #4. Following the deposit of $300,000 into the LUX Financial Services account # 5007, several transfers were made into the Leon Vaccarelli account # 1757 and the LWLVACC LLC account # 7501. Those funds were used to make the February ($5, 201.42), March ($7,001.76), and May ($2,815.93) mortgage payments on the property defendants. *See* Ex. B.

## VICTIM # 6

53.     Victim # 6 received a workers compensation settlement for approximately $800,000 in 2007. Her attorney introduced him/her to Investment Adviser Leon Vaccarelli, who has been managing him/her investments. In November 2015, VACCARELLI advised him/her to invest in a 36-month Certificate of Deposit at 7%. He did not say which financial institution offered the CD. On November 19, 2015, VACCARELLI faxed a partial withdrawal request to Prudential Annuities Center resulting in a $30,000 transfer to Victim #6's personal Bank account. VACCARELLI telephoned Prudential on November 20, 2015 to make an in inquiry on the distribution. VACCARELLI caused mutual funds to be sold from Victim #6's account at TIC on November 23, 2015. A $70,000 check was mailed to Victim #6 on November 24, 2015.

Victim #6 gave VACCARELLI a check made payable to LWLVACC, LLC.

54.    The $100,000 check was deposited into the LWLVACC LLC account # 7051 on November 30, 2015. On December 1, 2015, a check in the amount of $5,388.24 was deposited at Thomaston Savings Bank for the mortgage payment on property defendants. See Ex. B. The rest of the money was used to pay a commercial loan and to pay off another investor.

## VICTIM # 7

55.    Victim #7 has known Leon Vaccarelli since he was in kindergarten. Years later when VACCARELLI became a broker, he offered to manage Victim #7's pension. VACCARELLI is the treasurer of a church where s/he is a parishioner. In November 2016, s/he gave VACCARELLI a check for $72,696.00, which represented proceeds from a rollover retirement plan. VACCARELLI told Victim #7 that his/her money would be put in the best investment for his/her situation.

56.    On December 2, 2016, the $72,696.42 check was deposited into LUX Financial Services account # 5007 and comingled with Victim # 5's funds. In December 2016 and January 2017, several transfers were made to the Leon Vaccarelli account # 1757 and the LWLVACC LLC account # 7051 and used to make the February ($5, 201.42), March ($7,001.76), and May ($2,815.93) mortgage payments on the property defendants. *See* Ex. B.

## VICTIM #8

57.    In 1999 the beneficiary of a living trust amended the trust so that when s/he died, a percentage of the trust's proceeds would be held in trust for the benefit for the beneficiary's son/daughter, Victim #8. In 2008, the beneficiary of the trust died and the son/daughter became a beneficiary of the trust. The purpose of the trust was to pay for the son/daughter's health,

maintenance, and support. At the time of the beneficiary's death, a Connecticut bank functioned as the trustee of the trust.

58.     In January 2014, VACCARELLI became the trustee of the living trust, held for the benefit of Victim #8. At the beginning of 2014, the trust held approximately $480,000 in assets, which were invested in a mixture of blue-chip equity securities and mutual funds. Prior to the formal transfer of trustee responsibility, the bank asked VACCARELLI for direction as to the disposition of amounts held in mutual funds. VACCARELLI directed the bank to sell the mutual funds for cash. VACCARELLI provided his personal bank account number as the account to which the money should be deposited. On March 27, 2014, the bank wired over $164,000 into VACCARELLI's personal account. In September 2014, the bank transferred the last of the trust assets it held, approximately $21,000 in cash, to VACCARELLI's personal bank account.

59.     Also as part of the transfer of trustee responsibilities, on March 18, 2014 the bank transferred approximately $280,000 (market value) in blue chip equities such as Exxon Mobile, Abbott Labs, and Coca-Cola into a brokerage account in the name of the trust, with VACCARELLI having sole trading and check writing ability. From December 2014 through September 2016, VACCARELLI transferred over $200,000 from the trust's brokerage account to his personal and business accounts. A portion of this money went to personal expenses, including home mortgage payments, and expenses of VACCARELLI's business, including mortgage payments in connection with VACCARELLI's investment in an office building. Most, if not all of the mortgage payments on property defendants from April 11, 2014 through October 25, 2016 were either from Victim #8's funds or comingled with other victim's funds and used to

pay the mortgage. *See* Ex. B. By September 2016, the account had a $1400 balance; all the blue chip securities in the account had been sold.

## VICTIM #9

60.     On or about August 1, 2016, VACCARELLI suggested a new investment to Victim #9. VACCARELLI faxed a full surrender request to Voya requesting that a check be mailed to Victim #9. Voya issued a $94,619.81 check to Victim #9 on August 4, 2016.

61.     Victim #9 endorsed the check to LWLVACC, LLC and gave the check to VACCARELLI. The check was deposited on August 10, 2016. *See* Ex. B. LWLVACC's balance was negative prior to the deposit. The amount of $30,000 was transferred to VACCARELLI'S commercial property on August 15, 2016, the amount of $2,640.87 to a mortgage payment on August 31, 2016, and numerous personal expenses.

## CONCLUSION

62.     The property defendants were involved in a transaction or attempted transaction, or traceable thereto, in violation of 18 U.S.C. §§ 1956 and 1957, or represent property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); or that they constitute or are derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), namely mail or wire fraud in violation of 18 U.S.C. § 1341 or 1343, and are therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America respectfully asserts that there is reasonable belief that the property defendants are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) or (C); and requests

(a) that pursuant to 18 U.S.C. § 985(b)(2), and 18 U.S.C. § 981(j), which permits the Court to "take any action to…preserve the availability of the property subject to civil forfeiture," the Court issue the proposed Writ of Entry submitted with this Verified Complaint of Forfeiture authorizing the United States Marshals Service, or its delegate, to enter the property defendant, including any structures, on one or more occasions during the pendency of this in rem forfeiture action:

    (1)    for the purpose of conducting an inspection and inventory and appraisal of the property defendants, which inspection and inventory and appraisal may include still and video photography;

    (2)    to be accompanied on any such occasion by any appraiser(s) selected by it to appraise the condition and value of the property defendants pursuant to 19 U.S.C. § 1606;

    (3)    to be accompanied on any such occasion by any government or contract personnel selected by it for the purpose of conducting an inventory of the property defendants; and

    (4)    to be accompanied on any such occasion by any federal, state, or local law enforcement officers selected by it to ensure the safety of any person acting under the Writ of Entry.

(b) that the Court decree that the forfeiture of the property defendants to the United States under 18 U.S.C. §§ 981(a)(1)(A) or (C) is confirmed, enforced, and ordered;

(c) that the Court thereafter order that the United States Marshal, or his delegate, dispose of the property defendants as provided by law; and

(d)  that the Court award Plaintiff United States all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


   */s/ John B. Hughes*
JOHN B. HUGHES
CHIEF, CIVIL DIVISION
ASSISTANT U.S. ATTORNEY


   */s/ Julie G. Turbert*
JULIE G. TURBERT
ASSISTANT U.S. ATTORNEY
ATTORNEY BAR #ct23398
157 CHURCH STREET
NEW HAVEN, CT 06510
TELEPHONE: (203) 821-3700
FAX: (203) 773-5373
EMAIL: Julie.Turbert@usdoj.gov

19

<u>DECLARATION</u>

I am a Special Agent of the Federal Bureau of Investigation and the case agent assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture, and it is true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 23rd day of January, 2018.


___*/s/ Russell C. Day*_____
RUSSELL C. DAY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

SCHEDULE A

FIRST PIECE:

All that certain piece or parcel of land, with all the improvements thereon, situated in the City of Waterbury, County of New Haven and State of Connecticut, being shown as Lot 15 on a certain map entitled "SUBDIVISION PLAN 'COUNTRY CLUB HILLS' PREPARED FOR PHOENIX HOLDINGS, LLC COUNTRY CLUB ROAD WATERBURY, CONNECTICUT", Sheets 1 and 2 of 2, Scale 1" = 40' dated May 3, 2004, last revised August 24, 2005, prepared by Meyers Associates, P.C. 60 Linden Street Waterbury, Connecticut, which map has been recorded December 14, 2006, in Map Drawer 42, Pages 100 and 101 of the Waterbury Land Records.

Together with the terms, conditions, agreements, covenants, restrictions, obligations, reservations and easements set forth in Declaration of Country Club Hills, and the exhibits annexed thereto, by Phoenix Holdings, LLC dated April 25, 2007 and recorded April 25, 2007 in Volume 6106 at Page 11 of the Waterbury Land Records.

SECOND PIECE:

All that certain piece or parcel of land, with all the improvements thereon, situated in the City of Waterbury, County of New Haven and State of Connecticut, being shown as Lot 18 on a certain map entitled "SUBDIVISION PLAN 'COUNTRY CLUB HILLS' PREPARED FOR PHOENIX HOLDINGS, LLC COUNTRY CLUB ROAD WATERBURY, CONNECTICUT", Sheets 1 and 2 of 2, Scale 1" = 40' dated May 3, 2004, last revised August 24, 2005, prepared by Meyers Associates, P.C. 60 Linden Street Waterbury, Connecticut, which map has been recorded December 14, 2006, in Map Drawer 42, Pages 100 and 101 of the Waterbury Land Records.

Together with the terms, conditions, agreements, covenants, restrictions, obligations, reservations and easements set forth in Declaration of Country Club Hills, and the exhibits annexed thereto, by Phoenix Holdings, LLC dated April 25, 2007 and recorded April 25, 2007 in Volume 6106 at Page 11 of the Waterbury Land Records.



GOVERNMENT
EXHIBIT
A

| DATE | Acct Name | Acct# | Victim Deposits | House Payments | Amount |
|------|-----------|-------|-----------------|----------------|--------|
| 3/16/2012 | LWLVACC LLC | 7051 | Victim #1 | | 100,343.36 |
| 3/20/2012 | LWLVACC LLC | 7051 | | Eric Strachan (Contractor) | (35,000.00) |
| 4/17/2012 | LWLVACC LLC | 7051 | | Mortgage Payment | (1,164.58) |
| 4/27/2012 | LWLVACC LLC | 7051 | | Eric Strachan (Contractor) | (7,000.00) |
| 5/14/2012 | Leon Vaccarelli | 1757 | | Mortgage Payment | (1,164.59) |
| 1/16/2014 | LWLVACC LLC | 7051 | Victim #2 | | 38,862.61 |
| 3/27/2014 | Leon Vaccarelli | 1757 | Victim #8 | | 164,988.26 |
| 4/11/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,946.23) |
| 4/16/2014 | Leon Vaccarelli | 1757 | | mortgage Payment | (624.52) |
| 5/9/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,880.27) |
| 7/14/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,880.27) |
| 8/7/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,880.27) |
| 9/12/2014 | Leon Vaccarelli | 1757 | Victim #8 | | 21,310.42 |
| 10/1/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,725.58) |
| 10/10/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,659.62) |
| 11/28/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,659.62) |
| 12/8/2014 | LWLVACC LLC | 7051 | Victim #8 | | 5,000.00 |
| 12/16/2014 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,659.62) |
| 1/12/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 3,120.00 |
| 1/15/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 3,120.00 |
| 2/2/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,725.58) |
| 2/2/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,725.58) |
| 2/12/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | 2,725.58 |
| 2/12/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,725.58) |
| 2/13/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 8,000.00 |
| 2/18/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,659.62) |
| 2/23/2015 | LWLVACC LLC | 7051 | Victim #8 | | 8,000.00 |
| 3/6/2015 | LWLVACC LLC | 7051 | Victim #8 | | 5,000.00 |
| 3/13/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 9,116.00 |
| 3/27/2015 | LWLVACC LLC | 7051 | | Mortgage Payment | (5,466.16) |
| 5/8/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 4,982.00 |
| 5/16/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 7,500.00 |
| 5/23/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 4,000.00 |
| 5/30/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 11,000.00 |
| 6/1/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (5,466.16) |
| 7/10/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 6,840.00 |
| 7/16/2015 | LWLVACC LLC | 7051 | Victim #8 | | 550.00 |
| 7/21/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 3,250.00 |
| 7/21/2015 | Leon Vaccarelli | 1757 | | | (3,250.00) |
| 7/27/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 5,000.00 |
| 7/31/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 17,500.00 |
| 7/31/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,784.20) |
| 8/20/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 4,500.00 |
| 8/31/2015 | LWLVACC LLC | 7051 | Victim #8 | | 25,000.00 |



GOVERNMENT EXHIBIT B

| 9/1/2015 | LWLVACC LLC | 7051 | | Mortgage Payment | (5,456.16) |
|---|---|---|---|---|---|
| 9/21/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 6,000.00 |
| 9/28/2015 | LWLVACC LLC | 7051 | Victim #4 | | 47,000.00 |
| 11/3/2015 | Leon Vaccarelli | 1757 | | Mortgage Payment | (2,706.83) |
| 11/17/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 4,750.00 |
| 11/23/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 1,650.00 |
| 11/30/2015 | LWLVACC LLC | 7051 | Victim #6 | | 100,000.00 |
| 12/1/2015 | LWLVACC LLC | 7051 | | Mortgage Payment | (5,388.24) |
| 12/28/2015 | Leon Vaccarelli | 1757 | Victim #8 | | 2,000.00 |
| 1/15/2016 | Leon Vaccarelli | 1757 | | | 15,000.00 |
| 1/28/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 6,500.00 |
| 2/2/2016 | LWLVACC LLC | 7051 | Victim #8 | | 5,500.00 |
| 2/5/2016 | Leon Vaccarelli | 1757 | | Mortgage Payment | (5,347.70) |
| 2/9/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 7,500.00 |
| 2/10/2016 | Leon Vaccarelli | 1757 | | Mortgage Payment | (5,347.70) |
| 2/16/2016 | LWLVACC LLC | 7051 | Victim #3 | | 100,000.00 |
| 2/26/2016 | LWLVACC LLC | 7051 | | Mortgage Payment | (2,640.87) |
| 3/23/2016 | LWLVACC LLC | 7051 | | mortgage Payment | (2,640.87) |
| 4/18/2016 | LUX Financial Service | 5007 | Victim #2 | | 41,011.81 |
| 5/18/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 4,300.00 |
| 5/23/2016 | LUX Financial Service | 5007 | Victim #8 | | 5,000.00 |
| 6/2/2016 | Leon Vaccarelli | 1757 | | Mortgage Payment | (3,000.00) |
| 6/6/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 8,632.00 |
| 6/7/2016 | Leon Vaccarelli | 1757 | | Mortgage Payment | (3,000.00) |
| 6/17/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 4,500.00 |
| 6/30/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 4,000.00 |
| 7/8/2016 | Leon Vaccarelli | 1757 | | Mortgage Payment | (6,000.00) |
| 7/29/2016 | Leon Vaccarelli | 1757 | Victim #8 | | 1,900.00 |
| 7/29/2016 | LWLVACC LLC | 7051 | Victim #8 | | 850.00 |
| 8/10/2016 | LWLVACC LLC | 7051 | Victim #9 | | 94,619.81 |
| 8/30/2016 | LWLVACC LLC | 7051 | Victim #8 | Mortgage Payment | (2,640.87) |
| 8/31/2016 | LWLVACC LLC | 7051 | Victim #9 | Mortgage Payment | (2,640.87) |
| 10/14/2016 | Leon Vaccarelli | 1757 | | Mortgage Payment | (3,500.00) |
| 10/25/2016 | LWLVACC LLC | 7051 | | Mortgage Payment | (7,566.96) |
| 10/26/2016 | LWLVACC LLC | 7051 | Victim #8 | | 3,340.00 |
| 11/7/2016 | LWLVACC LLC | 7051 | Victim #8 | | 3,340.00 |
| 12/2/2016 | LUX Financial Service | 5007 | Victim #7 | | 72,696.42 |
| 1/17/2017 | LUX Financial Service | 5007 | Victim #5 | | 300,000.00 |
| 2/1/2017 | Leon Vaccarelli | 1757 | | mortgage Payment | (5,201.42) |
| 3/10/2017 | LWLVACC LLC | 7051 | | Mortgage Payment | (7,001.76) |
| 5/2/2017 | LWLVACC LLC | 7051 | | Mortgage Payment | (2,815.93) |